Okay, let's move on to our questions today. Our first case is 20-1531, ImageQuix v. Snapizzi. Mr. Cohen, why don't you go ahead and proceed? Thank you, and good morning, Your Honors. David Cohen on behalf of the appellants, Snapizzi. The fundamental question today is, is Snapizzi's claims invention within the scope of patentable subject matter? And the answer is yes. The 506 patent, 8794506, does not claim anything as abstract as organizing photographs or anything so nebulous. Its claims require a particular application. They all require embedding a coded component with a machine-readable element in a photograph and using machine image processing to associate other photographs with it. The claim technology is a specific, concrete, technical advance. Its advantages, the advantages that the patent provides, come from its solution. It doesn't claim a mere result. As a result, the claims are within the scope of patent law. Counsel, this is Judge Moore, and it may be that the district court's characterization of the abstract idea is broader than the claimed invention, but why isn't the abstract idea still just organizing photos with a divider? So the limitation I would be adding to the district court's abstract idea is just the use of a divider, which is the coded component, for example. So why isn't that still nonetheless an abstract idea? Because the claims don't recite organizing photos with a divider. There may be hundreds of ways of organizing photos with a divider. In fact, in our opening brief, we provided a baker's dozen examples of ways of sorting photos that don't infringe the claims. They specifically require a coded component that comprises a machine-readable element. That's a physical, concrete element. It's embedded within particular photographs, and then a data processing system that's configured to process them, to identify those with the coded components and associate other photographs to it. And part of what made this an advance is that nothing like it existed previously. When you talk about a coded component, are you talking about something like a bar code or really an alphanumeric string of characters? That's correct. The coded component, obviously, is coded. There's nothing about the coded component itself that is unique. It's using things that already existed as codes, as identifiers, as labels. And that would be things like bar codes or a string of letters and numbers that can be read by computers through optical character recognition technology, OCR. Am I right about all this? You're correct about all that. Okay. The coded component, yeah. It's a component, and the key aspect is that it's machine-readable and embedded in particular photographs. This is Judge Rayner, counsel. Could the coded component consist of, say, a picture of one finger or maybe three fingers of a hand? Would that be a machine-readable element? There's nothing that would support that in the specification. The specification refers specifically to machine-readability. I'm asking whether that would be a machine-readable element. I don't believe so, Your Honor. Not using the technology that was available when this was invented in 2009. Yeah, it refers to a 1D or 2D bar code, alphanumeric strings, a color code. It has to be designed for a data processing system to be able to recognize. And I don't think computers of the day were able to recognize how many fingers you're holding up. Okay. But when it comes down to it, what SnapEasy's invention disclosed was a better mousetrap. And, yes, the coded component could be a bar code, say, that obviously existed. Because to invent a better mousetrap, you're using existing materials in a new way. You don't have to come up with new wood or a new way of bending wire to assemble them in a way that was not only novel but well within the scope of patent law. Also, the coded component with this machine-readable element is a tangible object. You have to burn a photo, and you have to burn it into a photo, and we can show you how it's done. We've built it. You can put it in your hands. That's not abstract. Is that in the claims, like claim one? I don't have anything like that. Taking at least a first photograph of a coded component using a handheld-able camera. The coded component comprises a machine-readable element. Yes. Where in that is it explaining how you're going to burn the code? I'm sorry. I'm being colorful with my language, Your Honor. So taking at least a first photograph of the coded component. The specification is explicit in the text that this can involve, for example, taking a test shot, which is to say putting the coded component into the image of the photograph itself. That's what makes this different from what came before. Previous solutions required a separate record-keeping system. And the solution that SnapEasy's inventor came up with was to insert barcodes into photographic images themselves. Now, somebody wouldn't have thought of that because there's no existing way, there was no existing way to read those codes in the photos. You'd have to print them out and scan them with a barcode scanner, say, if you're using a barcode. So they had to also come up with the idea of using photographic image processing to locate, identify, and then sort the photographs according to the coded components with its machine-readable element in the photo itself. So, Counselor, where's the technological improvement that you bring up? It's not in the coded element because you've already said, I mean, it can be a barcode. So you don't have a technological improvement there. Where is your technological improvement? It is embedding that coded component in the photograph with its machine-readable element and then coming up with a machine image processing system to identify it and associate other photographs with that coded component, with that machine-readable element, and then organize the photos according to that association. I thought there was already equipment out there that could recognize things like barcodes, and there was already things like OCR. There were barcode scanners, absolutely. There was OCR, but there was not a barcode scanner in a photographic processing system. Because a barcode scanner, I don't know if you use them, of course we do. We've all used a supermarket checkout barcode scanner. It isn't within a photo management system. It isn't within image processing systems. But that's what the grocery store barcodes do. They organize everything. I would imagine when I go checkout and I'm doing a self-checkout and I run something through the barcode reader, there's something there that says, this is a vegetable or this is a meat product. Correct. You've got a printed label on your fruit, say, and you run that. That's simply what a barcode does. How did you improve on that? Other than the fact that you're relating it to a photograph. It's embedding it into a digital photograph, Your Honor, so that the photograph is the carrier, is a new data structure to carry the code and component and some machine-readable element, for example, a barcode, for organizing the photos that it is part of now. So instead of having a separate barcode reader or a separate film management system or shot counter or other way of identifying which set of photos you're taking, it's now embedded within a photograph of the set of photographs. Counsel, does a patent explain in technological terms how to embed the coded component and show me where it does that. It specifically says taking at least the first photograph, the coded component comprising a machine-readable element, and then second photographs that do not contain the coded component. Where are the technological terms that show how to embed the coded component? Embedded is in Claim 9, Your Honor, and I would go through the specification at more length, but my time for argument is up here. I'd like to reserve time for rebuttal. We'll give you your rebuttal time. Go ahead and answer Judge Raina's question, please. I also want to know where in the spec is the technological mechanism for doing this embedding. For embedding? By taking a photograph, there are a series of options presented. There you can present a card having... I'm sorry. I'm unclear. I want to know where in the specification. I'd like you to point me to column and line number where the technological advantage or improvement or method of achieving this is disclosed. Let me make sure I understand. I'm happy to point you to the patent, but you're asking for how to... What's the technology? What are the technological terms in the patent on how to embed the coded component? Sure. If you look at column seven of the patent, line five, for example, the photographer can take out a prepared business card with an embedded coded component, takes a picture of the card, gives it to the client. Alternatively, you can capture a photograph of a coded component displayed on a PDA. Alternatively, there's... Counsel, this is Judge Moore. That just says take out a prepared business card with an embedded component. You suggested, I thought, and perhaps I misunderstood in response to Judge Reyna, that the act of embedding these components into the device was part of the patented improvement. If I'm understanding your argument right, column seven is the result, right? Take a business card with an embedded component already. It isn't the act of embedding. That is part of the preparation that a photographer can do. Perhaps it's more accurate to look at column 13 near the bottom where it says the processing apparatus by which a coded component may be embedded to each photograph. The coded component is prepared, for example, on a card or on a PDA or on a device that is attached to the camera. I don't know where you... Column 13, can you please direct me... Column 13, the paragraph starting at line 61. In particular, the third line there. The coded component is prepared and included in the field of view of the camera so it is part of the final image. That's the embedding that we're talking about. So, taking a photo of the component? Yes. Okay. And that can be a business card? It can be a business card that has... Can it be somebody holding up two fingers in front of the camera and taking a picture of it? As I said before, I don't think two fingers would count as a machine-readable element, Your Honor. I'll just use that example. How about four fingers? I don't think the number of fingers is the issue, Your Honor. It has to be a machine-readable element of a coded component. And I don't think two fingers would fall under the claim language of a coded component containing a machine-readable element. It seems to me it would, and that's why I have grave concerns about the preemption risk in your argument. But, so... Okay, well, why don't we go ahead and hear from opposing counsel and we'll give you your rebuttal time, Mr. Cohen. Thank you, Your Honor. Mr. Jones? Thank you, Your Honor. I want to address the two issues that Mr. Cohen discussed with the court and for which the court asked questions. And I will take the machine-readable element first only because that's the question and the discussion we ended on. So, Judge Chin asked the question about using a barcode. And Snapezi argues again here that the coded component is a machine-readable element. But what Snapezi fails to tell the court here is that the coded component can also be human-readable. Now, the machine-readable component is the one structure that Snapezi asserts as adding the inventive concept to the invention. But there's nothing in the specification or the claims that says that the coded component must be only machine-readable and not also human-readable, like the two or three fingers that was just proposed. In fact, Your Honor, if you'll go to column 8, lines 31 through 40 of the patent, and that's the discussion of the machine-readable element and what it can be. The coded component is said to comprise a machine-readable and recognizable graphic image. And then there are four examples of that machine-readable graphic image provided. Counsel, I'm sorry, what column and line number? I'm sorry, column 8. Counsel, maybe hold the phone a little further away from your head or mouth or something you're yelling at. Oh, I'm sorry. Is that better, Your Honor? A little bit. Yeah, let me pick up the receiver. I'm sorry, I'm using a headset. Your Honor, is that better? Much better. Okay, column 1 square. Okay, I'm sorry, column 8, line 31 is where the discussion begins. And this is the discussion of the coded component. And as you can see, the coded component is said to comprise a machine-readable and recognizable graphic image. And then there are four examples of the machine-readable graphic. Well, there are more than four examples, but there are four examples that I want to focus on. There's a string of numbers, a string of characters, a color code, and an arrangement of colors. Now, Your Honors, obviously all of those items are human-readable as well as machine-readable. Numbers, characters, and colors can be read by both a machine and a human. So when one of those graphic images is employed in the method or the system, a machine or a human could perform all of the organizational steps that are recited in the claims. And this is particularly true, and this is where I want to take the Court next, with respect to all of the method claims, where those claims do not require a computer to perform the method steps. There's no machine imagery actually required by those claims. And I'd like to take the Court through the groups of claims here. There are three groups of claims in the SNAP-EASY patent. And you heard SNAP-EASY say that the claims require using machine imagery and using machine imagery processing. But, Your Honors, that is simply not in the claims. SNAP-EASY fails to read and understand its own claims and argues concepts that are not recited in the claims themselves. Counsel, assume I don't agree with you since Claim 1 speaks to a machine-readable element and a data processing system. So suppose I were to say at least some of the claims are tied to a computer system. Do you really want me to be parsing these claims and say, okay, well the ones that are clearly tied to a computer system are good to go, but the ones that maybe don't have the machine-readable element in them aren't? What is your response? No, Your Honor. Of course I don't want you to do that. Your Honor, if the claims are read as being tied to a data processing system, which I believe is incorrect, and I'll take you through that in a moment, but if they are, then the data processing system does nothing more than speed up a manual human activity of organizing photos. Just as was stated earlier, this is simply a patent. I think as you stated, Judge Moore, this is simply a patent where the abstract idea is organizing photos using a divider, either at the beginning of the set of photos or at the end of the set of photos. And that is something that has been done for years and years by a human. And all this process does is speed up, and it says this in the specification, the process is meant to speed up the process and allow the photographer to take more pictures and not waste his or her time with having to keep track of those pictures. In other words, the photographer's time is freed up. It has nothing to do with a technological solution to a technological problem. So obviously, even if there is a machine-readable component, and again, the machine-readable component does not mean that it cannot be human-readable, so this is really a process that's been practiced for years and years and years, and the only part that may not have been practiced is the fact that it's now done by a computer instead of by a human. Now, looking at the groups of claims, however, Your Honor, if you look at the first group of claims, 1 through 8 and 20, there are three action steps set forth. Photographs are taken with a camera. Some of the photographs have a coded component in them. Some of them don't. The second action step is sending the taken photographs to a data processing system, and the third step is then associating the uncoded photographs with a coded photograph. But contrary to what Stampisi would have this court believe, nothing in these claims requires that a data processing system ever actually use the coded component to do anything. There's not a word in this set of claims about using the coded component at all. If you look carefully at the claim language in Claim 1, the associating step merely requires that uncoded photographs be associated with the machine-readable component of a coded photograph. The claims do not require that a machine, such as a computer or a data processing system, do that associating. In these claims, the associating step is merely the organizing of human activity, which can be performed by a human without the use of any machine. But if the claim says wherein the data processing system is configured to process the photographs and associating the one or more second photographs with a machine-readable element, are you saying the and breaks it up and it's no longer the data processing system that's doing the associating? Your Honor, well, I don't know which one it is. I believe the and does break it up and go back to a separate method step. But regardless, just because a device is configured in a method claim to do something does not mean that the step actually is performed. They have to draft their claims correctly. Either it's a method step or it's a means plus function step, which is present in Claims 17 through 19. You can't have it both ways. It either has to be a structural limitation, in other words, something is configured to do something, or it has to be that an action is taken. And again, it's unclear here which way it is, but regardless of which way it turns out to be, this claim still is not set forth patent-eligible subject matter. Because if the and breaks it and association can be done by a human instead of a data processing system, then the data processing system has no action, doesn't take any action in the set of claims that start with Method Claim 1. The only thing that the data processing system... Is there some embodiment in the specification which indicates that this sorting and associating is being done by a human and not being done by a computer or a data processing system? Is there something in the spec that supports your idea that these claims are broad enough to include human processing? There's nothing specific in the specification, Your Honor, and obviously there wouldn't be because if they had set that forth in the specification, then these claims clearly would not be patent-ineligible. But that's not what's necessary to be done to understand a patent-ineligible claim. You have to look at the... Your problem, counsel, as far as I'm concerned, is this spec talks entirely about a computer system that's going to do this processing. And the preamble of all of these claims are a method to improve automation of a photography process. And then the claims themselves talk about machine-readable elements or data processing systems. I have to be honest. I think this is pretty much your weakest argument. I'm genuinely surprised that this is where you begin because, to me, I don't think it's a particularly strong argument to say that Claim 1 can be performed by a human when it has automation, machine-readable elements, and data processing systems, and where you want to break the and in a where-in clause, which makes no sense to me because I'm not sure what the associating is linked to if it's not linked to the data processing system. So, I mean, you're welcome to use your time however you wish, if you want to divide the claims up or whatever. But I don't know. I have to be honest. I'm not persuaded that Claim 1, for example, isn't directed to a computerized method of achieving this process. Yeah, this is Judge Chen. I do think for the remainder of the oral argument, given that we're on a Rule 12 motion grant, why don't you just assume that this is a computer-implemented claim and that we are talking about machine-readable coded components and we are talking about sending over these photographs from a camera to a computer and that the computer, because of the coded components, the computer knows how to associate all the various photographs into different groups and classifications? Your Honor, thank you. Yes, I will. So, assuming it is a computer-based invention, then the question becomes whether or not there's any technological advance, any technological solution to a technological problem, and whether the use of a computer adds to the invention, provides the inventive concept. Your Honor, with respect to the improvement to automation, that may be stated in the claims, but if you look at the specification and read the specification, this is not a patent. This is not an invention about improving an already-known automated process. It is simply about making a human activity performed by a computer. I understand the preambles to all the claims say improvement to automation, but that's not what the specification says. Counsel, I think you have a fundamental misunderstanding. The claims are part of the specification, so you're wrong when you say it's not what the specification says. I understand. I apologize, Your Honor. You're right. They are part of the specification. But if you go back and look at the specification, it's clear that the specification says that the invention is a process of automating image management. If you look at Column 1, Lines 14 through 15, and Lines 20 through 21, the problem that's being addressed by the invention is identified, and it's identified as image management. And the patent explains that, quote, photographers have sought solutions to the image management issue, close quote. And it says that it describes how photographers have solved the problem by manually managing images and says that these manual processes do not support automation. Then further, in Column 1, Lines 33-36, the specification says that the invention provides processes to automate the photography business. Your Honor, this is not a patent about improving an already known process of automation, and if they develop some computer software or some hardware that actually improved an automation process, then that might be patent eligible. But here, Your Honor, all that they are doing is taking a human process, the human process of organizing photographs, using a divider, using a divider picture, using a picture with somebody holding up two or three fingers or a business card, or in the example we gave in our brief, the old grade school example of class photographs where the first picture taken is of the entire class and it says Mrs. Smith, third grade class, and then all the photos after that are photographs with individuals in Mrs. Smith's third grade class. That's what this is. This is a patent about computerizing, automating a already known human organizing activity. And that's what this court and the Supreme Court have said is a patent ineligible idea. Anytime you merely use a computer to speed up and automate, it's not a patent eligible idea. Thank you, Your Honors. Okay, thank you. Mr. Cohen, you have some rebuttal time. Thank you, Your Honor. Counsel for ImageQuicks is keen to say that organizing photos is an already known activity, but there's no evidence that before this disclosure anyone ever organized photos using the systems and methods that were disclosed and claimed here. Organizing photos, even organizing photos with dividers, might be abstract, but we're not claiming anything nearly that broad. And even if there were a manual analog, that wouldn't make the claims abstract or take it out of the realm of patentable subject matter. If you look at data engine technologies, the spreadsheet tab interface clearly refers back to tabs that we're used to using in pendaflex folders in our filing systems, but you apply it in a new manner, in a new context, using new technology, and it's certainly within the realm of patentable subject matter. So, yes, there were previous approaches. There's parallel data systems. Photographers solved their image management problems manually by using a picture counter or separate memory card storage or film or folders for each job, and those weren't satisfactory. Counsel, how do you distinguish your case from TLI technologies? Thank you, Your Honor. TLI had extraordinarily broad claims. The claims on its face, said the court, the claims drawn to the concept of classifying an image and storing the image based on its classification. The claims there were far broader. The court in that case noted that attaching metadata... Is that what the claim actually said? Yes, Your Honor. I'm quoting the case, page 611. Or is that what we concluded that the claim was drawn to? I'm just trying to understand. That was what you had. I thought I heard you say that that was the actual claim language itself. I'm sorry. That's what the court... I'd be surprised that the claim language actually said it was drawn to the concept of classifying an image. Yes, that was the court speaking, and I encourage you to... That was the court's conclusion. That wasn't the actual claim language. That was not the claim language. The claim language was much broader than what SNAP TV has, though, and in particular, the court noted that there was first no... It was without any claim that the invention reflected an invented solution to any problem, and it failed to provide any technical details. Its claims were in purely functional terms, and the 506 patent claims do recite a new physical combination of elements, and they do recite the technical details rather than functional results. The coded components with machine-readable elements and the specifically configured processing systems that the 506 patent claims all require are not merely part of an environment in which photo organization operates. They're the crucial elements of the disclosed technology. They replace these traditional photographic sorting work at a photo shoot and provide the advantages. The photographer no longer has to bring a photo counter for each job or separate memory storage. They don't have to use a computer or barcode scanner at the job because they have a new data structure using the photographic film or digital processes themselves. That hadn't been done before, and when I talk about creating a better mousetrap... Wasn't it done in TLI? I mean, didn't they just have the classification information in TLI on each photo? Isn't that the big difference between the TLI invention and this invention? No, Your Honor. In TLI, they were just talking about attaching metadata to photos, dates and times associated with images. There was nothing about photographing a coded component and using that as a storage medium. Mr. Cohen, this is Judge Chen. I was just flipping through the figures of your client's patent, and could you just explain really quickly what's going on in figures 9A and 9B? 9A looks like a stick figure and, I guess, a human. A stick figure, human, and then it says coded component 900 next to it. Is that the first photo of the... grouped together? That's correct, Your Honor. Figure 9A is an example, a pretty sketchily drawn one, of a photograph of a subject with a coded component. Is that the coded component itself, or is that... No, that's a schematic, Your Honor. That is described in column 14 of the patent. It says, in an aspect right at the top of the column, the subject may hold the coded component while the photograph is being captured by the photographer, as illustrated in figure 9A. What does that mean, counsel? Is that stick figure a coded component or not? No, Your Honor. The stick figure is an example of a subject who the client, the student, say, who's being photographed. As it goes on further in column 14, round line 10, it says, in a case of a posed photo shoot, the individual or individuals being photographed may hold the coded component for a first test shot. All subsequent photographs would then be grouped with this coded component. This is just... This goes back to that preemption statement I made earlier. It seems to me that this patent would capture facial recognition technology. Absolutely not, Your Honor. Facial recognition is not... There's no coded component in facial recognition. There's no machine-readable element within a coded component in facial recognition. In fact, that was one of the examples we provided in our opening brief. Wouldn't a person's face... Wouldn't a person's face, the individuality, the uniqueness of the face, wouldn't that constitute a coded component? No, Your Honor. How does that differ from a barcode? A barcode is... Well, unless you've coded something into your face according to the meaning of the specification of the 506 patent, and you haven't. The 506 patent requires a coded component which can be decoded by the data processing system. For example, claim 10 requires determining what's in the coded component. It has to be a machine-readable element. Facial recognition was not part of the disclosure of the 506 patent. Systems that can identify clients according to their faces... Yeah, I know that facial recognition... ...are not encompassed by these claims. I know that facial recognition is not disclosed in the patent, but it seems to me that there's no limitations in the patent that would preclude the potential for facial recognition to be... to fall within the scope of these broad claims. I would caution, Your Honor, that these are not broad claims in the way that you're thinking, because a coded component that comprises a machine-readable element is basically distinguishable from a face. Even if we look at exactly the columns... Counsel, I say they're broad claims because we've asked you several times to identify the technological terms, for example, of embedding. How is that done? What's the technological term in the patent or the written description that you would point to? And your failure to do that leads me to this conclusion that these are very broad claims. Your Honor, the embedding is performed by photographing a code, a component. It gets embedded from wherever it is originally displayed, on a card, on a PDA, on a device attached to the camera, and gets embedded into the digital photographic image. I apologize if I thought that I had answered that question for you. Embedding is the taking of the photo, and the specification that refers to it is embedded a couple times. Okay, Counsel. Unless anyone has any further questions, I think we have your argument in this case. Colleagues, any further questions? No. Okay. I thank both Counsel for your arguments, and this case is taken under submission. Thank you, Your Honor. The Honorable Court is adjourned until tomorrow morning at 10 a.m.